IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BOSTON ATHLETIC ASSOCIATION,

    Plaintiff,

      v.

CAFEPRESS.COM, INC.,
ZAZZLE INC., and
JOHN DOES 1-10

    Defendants.

CIVIL ACTION NO. 1:10-cv-10740-DPW

**EXPEDITED CONSIDERATION
REQUESTED PURSUANT TO
LOCAL RULE 5.1(c)**

---

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY
INJUNCTION**

---

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ......................................................................... 2

   A.   The B.A.A. And The BOSTON MARATHON® Mark ................................. 2

   B.   The B.A.A. And The Unicorn Design Mark ................................................. 4

   C.   Defendants' Use Of Counterfeit and Infringing Marks ............................... 6

III. ARGUMENT ................................................................................................... 10

   A.   The Preliminary Injunction Standard ......................................................... 10

   B.   Plaintiff is Likely To Succeed On The Merits Of Its Counterfeiting Claim ................... 11

   C.   Plaintiff Is Likely To Succeed On The Merits Of Its Trademark  Infringement Claim ... 12

      1.   The B.A.A. Is The Owner of the BOSTON MARATHON® and the Unicorn Design Trademarks ........................................................................ 12

         a.   The B.A.A. Marks Are Federally Registered Trademarks ..................... 12

         b.   The B.A.A. Marks Are Protected Under Massachusetts Common Law ................. 13

      2.   The Defendants Are Using Similar Marks. ................................................. 14

      3.   The Defendants' Use of The B.A.A. Marks Is Likely To Cause Confusion. ............... 18

         a.   B.A.A. Is Entitled to a Presumption of Likelihood of Confusion .......... 18

         b.   Similarity of the Marks (Factor 1) ......................................................... 19

            1.   Defendants' Use of the B.A.A.'s Registered Marks ............................... 20

            2.   Use of Confusingly Similar Marks ...................................................... 20

         c.   Similarity of the Goods (Factor 2) ......................................................... 22

         d.   Channels of Trade, Advertising, and Purchasers (Factors 3, 4, and 5) ................. 23

         e.   Actual Confusion (Factor 6) ................................................................... 24

         f.   Defendant's Intent in Adopting Its Mark (Factor 7) ............................... 24

         g.   Strength of the Plaintiff's Mark (Factor 8) ............................................ 25

   D.   Absent An Injunction, Plaintiff Will Suffer Irreparable Harm .................... 26

      1.   Irreparable Harm is Presumed ................................................................. 27

      2.   Plaintiff's Lost Sales Are Difficult to Quantify ....................................... 28

      3.   Defendants' Inferior Products Will Damage the B.A.A.'s Reputation ....... 28

   E.   An Injunction Will Impose Minimal Harm On Defendant ............................ 29

   F.   The Public Interest Favors An Injunction To Prevent Confusion ................. 30

IV. CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

## CASES

American Waltham Watch Co. v. United States Watch Co.,
173 Mass. 85 (1899) .......................................................................................13

Bose Corp. v. QSC Audio Prods., Inc.,
293 F.3d 1367 (Fed. Cir. 2002)......................................................................25

Boston Athletic Ass'n v. Sullivan,
867 F.2d 22 (1st Cir. 1989)...........................................13, 17-19, 21-23, 25

Boston Duck Tours, LP v. Super Duck Tours, LLC,
531 F.3d 1 (1st Cir. 2008)...............................................................................21

Calamari Fisheries, Inc. v. The Village Catch, Inc.,
698 F.Supp. 994 (D. Mass. 1988) .................................................................30

Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.,
799 F.2d 6, (1st Cir. 1986).............................................................................27

Castricone v. Mical,
74 Mass.App.Ct. 591 (2009)..........................................................................13

Century 21 Real Estate Corp. v. Century Life of America,
970 F.2d 874 (Fed. Cir. 1992)........................................................................21

Digital Equipment Corp. v. AltaVista Technology, Inc.,
960 F. Supp. 456 (D. Mass. 1997) ................................................................30

Equine Technologies, Inc. v. Equitechnology, Inc.,
68 F.3d 542 (1st Cir. 1995)......................................................................13, 18

I.P. Lund Trading ApS v. Kohler Co.,
163 F.3d 27 (1st Cir. 1998)..........................................................11, 18, 25, 27

Keds Corp. v. Renee Int'l Trading Corp.,
888 F.2d 215 (1st Cir. 1989).........................................................19, 24, 27

Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.,
963 F.2d 350 (Fed. Cir. 1992)........................................................................26

Perfumania, Inc. v. Perfulandia, Inc.,
279 F. Supp. 2d 86 (D.P.R. 2003)..................................................................11

Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,
657 F.2d 482 (1st Cir. 1981)...........................................................................21

Recot, Inc. v. Becton,
  214 F.3d 1322 (Fed. Cir. 2000)..................................................................................25

Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,
  102 F.3d 12 (1st Cir. 1996)..................................................................................10, 11

Schawbel Corp. v. Conair Corp.,
  122 F. Supp. 2d 71 (D. Mass. 2000) ............................................................................29

Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,
  982 F.2d 633 (1st Cir. 1992)........................................................................11, 20, 27, 28

Star Financial Services, Inc. v. AASTAR Mortgage Corp.,
  89 F.3d 5 (1st Cir. 1996)..........................................................................................12

Trak Inc. v. Benner Ski KG,
  475 F. Supp. 1076 (D. Mass. 1979) ............................................................................30

Volkswagenwerk Aktiengesellschaft v. Wheeler,
  814 F.2d 812 (1st Cir. 1987) ....................................................................................18

## STATUTES

15 U.S.C. § 1116..............................................................................................................11
15 U.S.C. § 1127..............................................................................................................12

## I.    INTRODUCTION

The Boston Athletic Association Corporation (the "B.A.A.") respectfully requests that the Court enter a preliminary injunction against CafePress.com, Inc. ("CafePress") and Zazzle, Inc. ("Zazzle") (collectively, the "Defendants") ordering them to cease their sale of counterfeit goods bearing the B.A.A.'s BOSTON MARATHON® trademark and the B.A.A.'s Unicorn Design trademark (collectively, the "B.A.A. Marks").  The B.A.A. also respectfully requests that the Court preliminarily enjoin the Defendants' from using other confusingly similar designations that infringe the B.A.A.'s exclusive rights in its B.A.A. Marks.

Both Defendants are presently advertising and selling counterfeit BOSTON MARATHON® merchandise on their websites.  (Declaration of Guy L. Morse ("Morse Decl."), ¶ 23; Declaration of Amy L. Brosius ("Brosius Decl."), ¶¶ 3, 4, Exs. 1, 2.)  Defendant Zazzle is also advertising and selling merchandise bearing counterfeits of the B.A.A.'s Unicorn Design mark.  (Brosius Decl. at ¶ 7, Ex. 5.)  Both Defendants are advertising and selling merchandise bearing designations that are confusingly similar to the B.A.A.'s BOSTON MARATHON® mark, namely:  "BOSTON 26.2", "BOS 26.2", "BOSTON QUALIFIER", and designations comprised of the word "BOSTON", the year date, and a picture of a runner.  (Morse Decl. at ¶ 23; Brosius Decl. at ¶¶ 3, 4, 5, Exs. 1, 2.)  Defendants use these designations on merchandise that is highly similar – and in many cases identical – to that sold by the B.A.A. through its licensee.  Consumers are likely to believe – wrongly – that the Defendants' products are affiliated with or authorized by the B.A.A.

Each of the four preliminary injunction factors weighs heavily in favor of an injunction in this case.  If Defendants' activities are not enjoined, the valuable goodwill that the B.A.A. owns in its trademarks will be jeopardized, and the resulting damage will be irreparable.

## II.    FACTUAL BACKGROUND

### A.    The B.A.A. And The BOSTON MARATHON® Mark

The B.A.A. is among the nation's oldest athletic clubs.  Every year since 1897, the

B.A.A. has organized and conducted a marathon-length race in the Boston area.  (Morse Decl. at

¶ 4.)  The BOSTON MARATHON® event is the nation's oldest marathon event still in existence.

(*Id.*)  Over the years the number of participants has grown to tens of thousands of elite runners,

wheelchair participants, and official qualifiers.  (*Id.* at ¶ 5.)  The 100th running of the B.A.A.'s

BOSTON MARATHON® race in 1996 was recognized by the Guinness Book of World Records

as the world's largest marathon at that time, finishing more than 35,000 runners.  (*Id.*)  Runners

come from around the globe to compete in the BOSTON MARATHON® race every year.  (*Id.* at

¶ 6.)  Hundreds of thousands of live spectators line the BOSTON MARATHON® race route

every year, and more watch the live broadcast and news coverage of the event on television.

(*Id.*)

Runners must participate in a prior qualifying Marathon event in order to be eligible to

receive a "bib number" for the BOSTON MARATHON® race.  (*Id.* at ¶ 7.)  To qualify for

"Boston" is no mean feat; to finish "Boston" – including the race's legendary "Heartbreak Hill"

– means nothing short of bragging rights.  The BOSTON MARATHON® is well-known

throughout the world as the premier marathon sporting event.  (*Id.* at ¶ 8.)

No admission is charged to spectators who view the BOSTON MARATHON® race along

the public roads and streets.  (*Id.* at ¶ 9.)  Consequently, the B.A.A., a non-profit corporation,

must rely on other revenue sources to subsidize the event.  (*Id.*)  The B.A.A. depends almost

exclusively on contributions from official sponsors, licensing fees, and participant entry fees to

defray the costs of organizing and conducting the BOSTON MARATHON® race.  (*Id.*)  The

bulk of the multi-million dollar cost of organizing and conducting the BOSTON MARATHON®

event comes from payments made by official sponsors and royalties from the B.A.A.'s trademark

licensing program.  (*Id.*)  The B.A.A.'s ability to put on the BOSTON MARATHON® race is

directly tied to its ownership and ability to exclusively control the use of the BOSTON

MARATHON® trademark and other marks the B.A.A. exclusively owns.  (*Id.* at ¶ 10.)  The

goodwill that has come to be associated with the BOSTON MARATHON® mark and the

B.A.A.'s other trademarks represent a valuable asset belonging to the B.A.A.  (*Id.* at ¶¶ 10, 20,

21)

The B.A.A. owns common law rights in the BOSTON MARATHON® mark throughout

the United States.  Starting at least as early as 1980 and continuing through today, the B.A.A. has

used the BOSTON MARATHON® mark, through its official licensees, on and in connection with

a variety of apparel and merchandise including clothing, hats, jewelry, mugs, bags, posters, and

emblems.  (*Id.* at ¶ 12.)  BOSTON MARATHON® official merchandise is sold throughout the

United States, in retail stores and via Internet websites to the general population.  (*Id.* at ¶¶ 13-

19.)

The B.A.A. is also the sole and exclusive owner of two U.S. trademark registrations,

issued on the principal register, for the BOSTON MARATHON® mark.  (*Id.* at ¶ 22, Ex. 8.)

Both registrations are valid and incontestable pursuant to 15 U.S.C. § 1065.

The B.A.A.'s BOSTON MARATHON® mark is a famous mark.  The B.A.A. has for

decades expended considerable efforts and resources promoting the BOSTON MARATHON®

event.  (*Id.* at ¶¶ 20-21.)  For years, the B.A.A. has operated a licensing program that makes

official BOSTON MARATHON® merchandise available to the public.  (*Id.* at ¶¶ 13-19.)  The

B.A.A. has also expended considerable efforts and resources to enforce its exclusive and

valuable rights in the BOSTON MARATHON® mark, and the public recognizes the BOSTON

MARATHON® mark as indicating a single source of the B.A.A.'s goods and services.  (*Id.* at ¶¶

20-21.)

B.     **The B.A.A. And The Unicorn Design Mark**

Since about 1897, the B.A.A.. has used a design of a unicorn in connection with the

staging of marathon events:



(*Id.* at ¶ 11.)

Since 1980, the B.A.A. has used this design, through various licensees, on and in

connection with the sale of a variety of apparel and merchandise, including clothing, hats,

jewelry, mugs, bags, posters, and emblems.  (*Id.* at ¶ 12.)

Beginning in 1996 and continuing until today, the B.A.A. began using a modified version

of its unicorn design (the "Unicorn Design")[1] in connection with organizing and conducting the

BOSTON MARATHON® event:



(*Id.* at ¶¶ 11-12.)  Similar to its use of BOSTON MARATHON®, the B.A.A. uses the Unicorn

Design on and in connection with a variety of apparel and merchandise including clothing, hats,

jewelry, mugs, bags, posters, and emblems, through its various licensees.  (*Id.*)  Merchandise

---

[1] The Unicorn Design and BOSTON MARATHON® mark are collectively hereinafter referred to herein as the "B.A.A. Marks."

bearing the official B.A.A. Unicorn Design is sold throughout the United States, in retail stores and via Internet websites to the general population.  (*Id.* at ¶¶ 13-19.)  Recently, the B.A.A. began using an updated version of its Unicorn Design through select licensees:



(*Id.* at ¶ 11.)

The B.A.A. owns common law rights in the Unicorn Design mark throughout the United States.  People from all over the United States take part in the annual BOSTON MARATHON® sporting event, in connection with which the Unicorn Design is prominently used, either as participants or as spectators, and BOSTON MARATHON® official merchandise bearing the Unicorn Design is sold throughout the United States, in retail stores and through Internet websites.  (*Id.* at ¶¶ 11-19.)  The goodwill that has come to be associated with the Unicorn Design mark is a valuable asset that belongs to the B.A.A.  (*Id.* at ¶ 10.)

The B.A.A. is also the sole and exclusive owner of a U.S. trademark registration, issued on the principal register, for the Unicorn Design mark.  (*Id.* at ¶ 22.)  This registration is valid and incontestable pursuant to 15 U.S.C. § 1065.

The B.A.A.'s Unicorn Design is a famous mark.  The B.A.A. has for decades expended considerable efforts and resources promoting the Unicorn Design mark (both in its original and current iterations) in conjunction with the BOSTON MARATHON® event and on and in connection with the sale of official BOSTON MARATHON® merchandise.  (*Id.* at ¶¶ 11-12, 20-21.)  The B.A.A. has expended considerable efforts and resources enforcing its exclusive and

valuable rights in the Unicorn Design mark and the public recognizes the Unicorn Design mark as indicating a single source of the B.A.A.'s goods and services.  (*Id.*)

C.      **Defendants' Use Of Counterfeit and Infringing Marks**

Long after the B.A.A. began using the B.A.A. Marks in commerce, Defendants began using counterfeits and infringements of the B.A.A. Marks on merchandise and in advertising, in a blatant attempt to confuse the public and trade on the goodwill the B.A.A. has established in its famous marks.  The goods sold by Defendants are highly similar and in many cases *identical* to the goods protected by the B.A.A.'s federal trademark registrations, and sold by the B.A.A. through its official licensees, such as clothing, hats, and mugs.  (*E.g. id.* at ¶ 23; Brosius Decl. at ¶¶ 3-7, Exs. 1, 2, 3.)  For example, Defendant CafePress is currently selling *over 8000* "Boston Marathon Gifts" on its website:



(Morse Decl. at ¶ 23; Brosius Decl. at ¶ 3, Ex. 1.)



(*Id.*)

None of these items reflect authorized B.A.A. merchandise. (Morse Decl. at ¶ 24.)

Many bear counterfeits of the B.A.A.'s BOSTON MARATHON® mark. Others use

designations that are confusingly similar to BOSTON MARATHON® such as "BOSTON 26.2",

"BOS 26.2", "BOSTON QUALIFIER", and a designation comprised of the word "BOSTON"

with the year date and a picture of a runner. CafePress advertises these items interchangeably as

"BOSTON MARATHON" items and "BOSTON 26.2" items. (*Id.*)

Defendant Zazzle is advertising over 1400 "Boston Marathon Gifts" on its website:



(Morse Decl. at ¶ 23; Brosius Decl. at ¶ 4, Ex. 2.)



(*Id.*)

Some of the items advertised and sold by Zazzle bear counterfeits of the B.A.A.'s "BOSTON MARATHON" and Unicorn Design marks. Many also bear the confusingly similar designation "BOSTON 26.2." Zazzle advertises these items interchangeably as "BOSTON MARATHON" items, "BOSTON 26.2" items, and "BOSTON MARATHON QUALIFIER" items.

The B.A.A. learned of these Defendants' activities on April 1, 2010. (Morse Decl. at ¶ 23.) On April 3, the B.A.A., through its counsel, engaged a private investigator to purchase merchandise from both Defendants. (Brosius Decl. at ¶ 6.) On April 15, the merchandise was received and examined. (*Id.*) The Defendants' products are inferior substitutes for the B.A.A.'s officially licensed goods. (Morse Decl. at ¶ 25.) adidas is the B.A.A.'s official apparel licensee, and the adidas merchandise bearing the B.A.A. Marks are high-quality athletic wear. (*Id.* at ¶¶ 14, 25.) The infringing samples obtained from the Defendants reflect goods that are of low quality, both in terms of design format and materials. (*Id.* at 25.)

This complaint and the subject motion for preliminary injunction followed on the instant date, April 30, 2010.

## III. ARGUMENT

### A.      The Preliminary Injunction Standard

The four factors to be considered in a preliminary injunction analysis are: (1) the likelihood that plaintiff will succeed on the merits, (2) the risk of irreparable harm to the plaintiff absent an injunction, (3) the balance of hardships and (4) the public interest. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). In trademark cases, a plaintiff is entitled to a preliminary injunction even without separate proof of irreparable injury, since a showing of likelihood of success creates a presumption of irreparable harm. *Societe Des*

*Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992); *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir. 1998) ("When considering claims based on copyright, trademark or trade dress infringement, irreparable harm may be presumed even in the absence of demonstration of actual injury"). "By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement as a matter of law." *Perfumania, Inc. v. Perfulandia, Inc.*, 279 F. Supp. 2d 86, 103-104 (D.P.R. 2003).

Defendants' use of identical and confusingly similar marks, in connection with identical and highly similar goods as those sold by the B.A.A. through its licensees, to the same type of consumers, and through the same type of trade channels, constitutes infringement because it creates a likelihood of confusion as to source among consumers. The harm to the B.A.A. from this ongoing infringement is irreparable. *See Perfumania*, 279 F. Supp. 2d at 104 ("irreparable harm flows from an unlawful trademark infringement as a matter of law"). An injunction will serve the public interest by removing counterfeit and infringing products from the marketplace, thereby preventing consumer confusion. Accordingly, the B.A.A.'s motion for a preliminary injunction should be granted. *Ross-Simons*, 102 F.3d at 15.

**B.      Plaintiff is Likely To Succeed On The Merits Of Its Counterfeiting Claim**

B.A.A. is likely to succeed on its claim of counterfeiting under 15 U.S.C. § 1116(d). A "counterfeit mark" is defined under the statute as:

> (i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered

15 U.S.C. § 1116(d)(1)(B).  "Counterfeit" is defined under the statute as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.

It is undisputable fact that: 1) each of the B.A.A. Marks are registered on the principal register; 2) Defendant CafePress is at least using the BOSTON MARATHON mark on hats; 3) Defendant Zazzle is at least using the BOSTON MARATHON mark on shirts, hats, and mugs, and is using the Unicorn Design mark on shirts; and 4) the goods sold by Defendants and which bear the B.A.A.  Marks are identical to the goods covered under the B.A.A.'s principal register registrations for the marks.  (Morse Decl. at ¶¶ 22-24; Brosius Decl. at ¶¶ 3-7, Exs. 1-5.)

Defendants have no colorable argument that they are not liable for counterfeiting.  There is therefore a strong likelihood that B.A.A. will succeed on the merits of this claim, and injunctive relief is therefore warranted.

### C.  Plaintiff Is Likely To Succeed On The Merits Of Its Trademark Infringement Claim

To prevail on its claim for trademark infringement, B.A.A. must show: (1) that it owns a protectable trademark; (2) that Defendant is using a similar mark; and (3) that Defendant's use is likely to confuse the public. *Star Financial Services, Inc. v. AASTAR Mortgage Corp*., 89 F.3d 5, 9 (1st Cir. 1996).  B.A.A. is likely to succeed on all prongs.

### 1.  The B.A.A. Is The Owner of the BOSTON MARATHON® and the Unicorn Design Trademarks

#### a.  The B.A.A. Marks Are Federally Registered Trademarks

B.A.A. is the owner of two federal incontestable registrations for the mark BOSTON MARATHON® in block letter form, that together cover a variety of goods and services including entertainment services, clothing, hats, mugs, and emblems.  (Morse Decl. at ¶ 22, Ex. 8)  The B.A.A. is also the owner of a federal incontestable registration for the Unicorn Design, for

similar goods and services.  (*Id.*)  These registrations issued on the principal register of the

United States Patent and Trademark Office as Nos. 1,832,708, 1,346,832, and 2,792,075,

respectively.  (*Id.*)  Because the B.A.A. Marks issued on the principal register, they are entitled

to a legal presumption of validity.  *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d

542, 545 (1st Cir. 1995).

### b.      The B.A.A. Marks Are Protected Under Massachusetts Common Law

Massachusetts common law has long protected the value of a trade or business name

imbued with a "secondary meaning."  *See, e.g. American Waltham Watch Co. v. United States

Watch Co.*, 173 Mass. 85, 85-86 (1899).  A "secondary meaning" is a distinctive association in

the minds of the consuming public between an otherwise plain name and a singular source of a

product or services.  *Castricone v. Mical*, 74 Mass.App.Ct. 591, 594 (2009) (citing cases).  The

existence of this association is a question of fact, wherein the fact-finder can consider a "variety

of factors in determining whether words . . . have acquired secondary meaning." *Id.*  This can

include the length of use of the name, strength of the mark, extent of use, degree of public

recognition, *etc.  See Id*.

The B.A.A. has long-standing common law trademark rights in the B.A.A. Marks.  The

B.A.A.'s use of the BOSTON MARATHON® and the Unicorn Design in the Commonwealth

has been continuous, substantial, and exclusive since at least 1897 in connection with organizing

and conducting marathon races.  (Morse Decl. at ¶ 11.)  Beginning in 1980 and continuing to the

present, the B.A.A. used these marks on and in connection with the sale of various apparel and

merchandise, including clothing, hats, jewelry, mugs, bags, posters, and emblems.  (*Id.* at ¶ 12.)

The Marks enjoy broad recognition in the public at large, not just in the running community.  As

the First Circuit noted, "[t]here is but one Boston marathon race."  *Boston Athletic Ass'n v.*

*Sullivan*, 867 F.2d 22, 29 (1st Cir. 1989).  The Marks are therefore also entitled to common law trademark protection.

### 2.     The Defendants Are Using Similar Marks.

There can be no question that Defendants use the B.A.A. Marks.  Defendant CafePress advertises over 8000 goods, and Defendant Zazzle advertises over 1500 goods as "Boston Marathon Gifts."  (*Id.* at ¶ 23; Brosius Decl. at ¶¶ 3-4.)  In addition, both Defendants are advertising and selling goods bearing the B.A.A. Marks or confusingly similar variations thereof. Representative examples include:

| B.A.A. Mark | CafePress Use |
| --- | --- |
| BOSTON MARATHON |  |

| B.A.A. Mark | CafePress Use |
|---|---|
| BOSTON MARATHON<br><br>B.A.A. v. Sullivan, 867 F.2d 22, 30 (1st Cir. 1989), (the combination of the elements "BOSTON" plus a picture of a runner, plus the year date is similar to "BOSTON MARATHON") |  |
| BOSTON MARATHON |  |

| B.A.A. Mark | Zazzle Use |
|---|---|

| B.A.A. Mark | Zazzle Use |
|---|---|
| BOSTON MARATHON |  |
| BOSTON MARATHON |  |

| B.A.A. Mark | Zazzle Use |
|---|---|
| BOSTON MARATHON |  |
| BOSTON MARATHON and | |

(*See, e.g.* Brosius Decl. at ¶¶ 3-7, Exs. 1-5.)

While many of the items offered for sale on Defendants' websites bear the identical

B.A.A. Marks, some bear confusingly similar marks.  These goods also infringe.  *Boston Athletic*

*Ass'n*, 867 F.2d at 29-30 ("The district court's holding that plaintiffs' rights did not sweep any

further than their actual marks is not a correct application of trademark law.  Such a rule would

eviscerate trademark law").  The test for similarity is whether the <u>meaning</u> of the similar marks used by Defendants is identical to the meaning of the B.A.A. Marks.  *Id.* ("Here, the meaning of the two marks is more than similar, it is identical. This overcomes any difference in appearance between them").  Thus, if "[i]t is evident that defendants' logos refer specifically to the 'Boston Marathon,'" then they infringe.  Even a cursory review of each of the above samples makes clear that each item is using a BOSTON MARATHON mark or a designation, such as BOSTON 26.2 that is confusingly similar to the BOSTON MARATHON mark.  Defendants have no plausible argument otherwise.

> **3.      The Defendants' Use of The B.A.A. Marks Is Likely To Cause Confusion.**

To determine whether a likelihood of confusion exists, courts in the First Circuit consider eight factors: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.  *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987).  The channels of trade, parties' advertising, and classes of prospective purchasers factors are usually analyzed together. *Equine Technologies, Inc.*, 68 F.3d at 546.  While each factor must be considered, no one factor is necessarily determinative.  *Volkswagenwerk*, 814 F.2d at 817.  The factors are non-exclusive, and are not always apt to the particular facts of a case. *I.P. Lund*, 163 F.3d at 43.

> **a.      B.A.A. Is Entitled to a Presumption of Likelihood of Confusion**

The First Circuit held in a nearly identical case that the B.A.A. was entitled to a rebuttable presumption in its favor that the sale of goods displaying the B.A.A. Marks or confusingly similar marks creates a likelihood of confusion.  *Boston Athletic Ass'n v. Sullivan*,

867 F.2d 22, 32-35 (1st Cir. 1989).  In that case, the Court held that the relevant context against which each factor of the "likelihood of confusion" analysis must be assessed is whether the purchasing public is likely to believe that the sponsor of the BOSTON MARATHON® event produces, licenses, or otherwise endorses another's products.  *Boston Athletic Ass'n*, 867 F.2d at 29.  That is, "[w]hether or not purchasers happen to know that the sponsor of the Boston Marathan [sic] is an organization called the 'Boston Athletic Association' is irrelevant to this 'likelihood of confusion' analysis."  *Id.* at 32.  Because "(1) defendants intentionally referred to the Boston Marathon on [their goods], and (2) purchasers were likely to buy the [goods] precisely because of that reference, we think it fair to presume that purchasers are likely to be confused about the [goods'] source or sponsorship."  Such is the case here.

Notwithstanding this presumption, each of the eight *Volkswagenwerk* factors heavily supports B.A.A.'s motion for a preliminary injunction, as discussed more fully below.

### b.  Similarity of the Marks (Factor 1)

This first factor weighs heavily in B.A.A.'s favor.  Defendants have used, and continue to use, the B.A.A.'s *identical* BOSTON MARATHON® and Unicorn Design marks directly on their products and in connection with the advertising and sale of those and other products.

Additionally, Defendants' use of the designations "BOSTON 26.2", "BOS 26.2", "BOSTON QUALIFIER", and a designation comprised of the word "BOSTON" in conjunction with a picture of a runner and the year date, are each confusingly similar to the B.A.A.'s BOSTON MARATHON® mark, where each falsely suggest sponsorship by or affiliation with the BOSTON MARATHON® event.  *See Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir. 1989) (affirming preliminary injunction where defendant used a confusingly similar trademark).

### 1.   Defendants' Use of the B.A.A.'s Registered Marks

Defendants' repeated use of the B.A.A. Marks on and in connection with the sale of their goods is plainly calculated to confuse consumers into believing that they are purchasing officially licensed B.A.A. goods, or at the very least goods that are somehow affiliated with the BOSTON MARATHON® event or sanctioned by the B.A.A.  For example, Defendant CafePress's website advertises over 8000 products as "Boston Marathon Gifts," including apparel, bumper stickers, hats, and mugs.  (Brosius Decl. at ¶ 3.)  Defendant Zazzle's website contains multiple pages that similarly advertise over 1500 "Boston Marathon Gifts", including apparel, bags, ties and mousepads.  (Brosius Decl. at ¶ 4.)  In fact, Defendant Zazzle even offers for sale a T-Shirt that contains the B.A.A.'s registered Unicorn Design mark along with the text "109th Boston Maration®."  (Brosius Decl. at ¶ 7, Ex. 5.)  Both of the Defendants' websites also repeat the use of "Boston Marathon" in the address bar of their webpages.  (Brosius Decl. at ¶¶ 3-4.)

It is clear that Defendants' use of the B.A.A. Marks is intended to confuse consumers into believing they are viewing and purchasing official B.A.A. and/or BOSTON MARATHON® goods, or that the Defendants are somehow affiliated or associated with the B.A.A.  *See Societe des Produits Nestle*, 982 F.2d at 639 (trademark infringement arises from usage likely to cause confusion as to affiliation).  Injunctive relief is warranted as to these uses by Defendants.

### 2.   Use of Confusingly Similar Marks

The Defendants' use of the designations "BOSTON 26.2", "BOS 26.2", "BOSTON QUALIFIER", and a designation comprised of the work "BOSTON" in conjunction with a picture of a runner and the year date, are each confusingly similar to the B.A.A.'s BOSTON MARATHON® mark.  "The considerable reliance on trademarks by consumers creates an

incentive for other competing, and typically less successful businesses, to pass off their inferior

brand as the successful brand by adopting a confusingly similar trademark, in effect

appropriating the goodwill created by the producer of the successful brand." *Boston Duck*

*Tours, LP v. Super Duck Tours*, LLC, 531 F.3d 1, 12 (1st Cir. 2008) (quotations omitted).

Trademark law is designed, in part, to prevent these "passing-off" practices and the consumer

confusion that results from it. *Id.*; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29-30 (1st Cir.

1989) ("The district court's holding that plaintiffs' rights did not sweep any further than their

actual marks is not a correct application of trademark law.  Such a rule would eviscerate

trademark law").

"[S]imilarity is determined on the basis of the total effect of the designation, rather than a

comparison of individual features," taking into account the marks' sound, appearance, and

meaning. *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st

Cir.1981).  Where, as here, the goods sold by the parties are nearly identical, a lesser degree of

similarity is required to demonstrate a likelihood of confusion. *Century 21 Real Estate Corp. v.*

*Century Life of America*, 970 F.2d 874, 877 (Fed. Cir. 1992) ("When marks would appear on

virtually identical goods or services, the degree of similarity necessary to support a conclusion of

likely confusion declines.").

Given this lowered bar, it becomes clear that Defendants' use of the aforementioned

designations amounts to use of marks that are confusingly similar to the B.A.A.'s registered

BOSTON MARATHON[®] mark.  Each of the Defendants' designations merely substitute the

"MARATHON" portion of the B.A.A.'s mark with an equivalent word or picture.  That is,

instead of using the term "MARATHON", Defendants merely substitute the term "26.2" — the

well-known length in miles of all marathon events — or a picture of a runner along with the year

or date (and in the case of Zazzle, the complete month, day, and year, *see* Brosius Decl. at ¶¶ 4,

6, Ex. 4.) of BOSTON MARATHON® events.  *See Boston Athletic Ass'n*, 867 F.2d at 29-30.

Defendants also substitute the word "QUALIFIER" in place of "MARATHON", which is also a

confusingly similar use.  Runners must participate in a qualifier marathon to be eligible to

receive a "bib number" and participate in the BOSTON MARATHON® event.  (Morse Decl. at ¶

7.)  The use of the word "QUALIFIER" is thus intended to evoke the same meaning as

MARATHON, in context.  "[T]he meaning of the two marks is more than similar, it is identical.

This overcomes any difference in appearance between them."  *Id.* at 30.

These designations are each confusingly similar to the B.A.A.'s BOSTON

MARATHON® mark, therefore an injunction that prohibits use of these designations by the

Defendants is also warranted.

### c. Similarity of the Goods (Factor 2)

Many of the Defendants' goods are identical to the B.A.A.'s goods.  The B.A.A. Marks

are used and registered for apparel and other items such as mugs and hats, and these are the same

items sold by Defendants on their websites, and on which Defendants' use the B.A.A. Marks.  It

would be difficult to find a more complete overlap of goods in a trademark case.

Other goods sold by the Defendants and bearing the B.A.A. Marks or confusingly similar

designations of the B.A.A. Marks are highly similar to the B.A.A. goods.  For example, the

B.A.A. uses and has registered the B.A.A. Marks for "embroidered emblems," "souvenir

program books," "maps," "lithographic prints," and "posters."  Defendants' stickers and magnets

are highly similar to these goods.

When a plaintiff and defendant offer "virtually the same goods[,]" "there is a strong

likelihood of confusion[,]" and thus a preliminary injunction should be granted.  *Boston Athletic*

*Association v. Sullivan*, 867 F.2d 22, 30 (1st. Cir. 1989).  Thus, this factor weighs heavily in the B.A.A.'s favor.

> **d.      Channels of Trade, Advertising, and Purchasers (Factors 3, 4, and 5)**

The similarity of the parties' channels of trade, advertising, and purchasers also supports the conclusion that confusion is likely.  The B.A.A. licenses the B.A.A. Marks to select entities who sell official B.A.A. merchandise through stores and as well as online, throughout the United States.  (Morse Decl. at ¶¶ 13-19.)  Defendants also sell their infringing goods online, through their respective websites.  Defendants moreover appear ready, willing, and able to ship their goods anywhere in the country, and have shipped goods at least into Massachusetts.  (Brosius Decl. at ¶ 5.)  The target consumer for both sides' products also appears to be the same: average consumers interested in obtaining commemorative merchandise of the annual BOSTON MARATHON® event.  This conclusion is born out by the Defendants' characterization of their goods as "Boston Marathon **Gifts**" (emphasis supplied).  (*Id.* at ¶¶ 3-4.)

The fact that both the officially licensed and Defendants' infringing goods are sold as souvenirs of the BOSTON MARATHON® event militates in B.A.A.'s favor because inexpensive items, bought by the casual purchaser, are not likely to be bought with great care.   "The purchasing public's lack of opportunity to exercise discrimination in making [] purchases . . . point[s] toward a likelihood of confusion."  *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 30 (1st Cir. 1989).

Although the full extent of Defendants' advertising is not yet known, there is direct overlap in Plaintiff's and Defendant's advertising at least on the Internet, where B.A.A.'s officially licensed goods compete directly with Defendants' goods.  (See Morse Decl. at ¶¶ 13-19, 23-24.)  In fact, as noted above, the Defendants each use the B.A.A.'s BOSTON

MARATHON® mark prominently on their respective websites.  (Brosius Decl. at ¶¶ 3-4.)  This use is likely intended to draw search engine traffic and to lure potential customers away from the websites of B.A.A.'s official licensees, and make them believe that they are viewing legitimate merchandise.  Thus, this trio of factors also strongly favors the B.A.A..

### e.      Actual Confusion (Factor 6)

Although the existence of examples of actual confusion is among the strongest evidence of a likelihood of confusion, "[i]t is not necessary to show actual confusion" to prevail in a case for trademark infringement.  *Keds Corp. v. Renee International Trading Corp.*, 888 F.2d 215, 218 (1st. Cir. 1989).  The B.A.A. is thus far aware of no instances of actual confusion.  Thus, this factor favors neither side.

### f.      Defendant's Intent in Adopting Its Mark (Factor 7)

Defendants' use of the B.A.A. Marks is plainly intended to trade on the goodwill and brand recognition that the B.A.A. Marks enjoy – which is substantial and which was derived only after a significant period of time, and investment of time and money on the part of the B.A.A.  (Morse Decl. at ¶¶ 20-21.)  The B.A.A.'s long-standing use and promotion of goods and services under the B.A.A. Marks makes it a near certainty that Defendants were aware of the B.A.A. Marks long before they began to infringe.  There is no plausible argument that Defendants' use of the B.A.A. Marks as well as confusingly similar designations was innocent or was not intended to create an association with the B.A.A. and/or the BOSTON MARATHON® event.  Thus, there is no other explanation for the Defendants' actions than a bald intent to free ride on B.A.A.'s goodwill.

> [W]hen a manufacturer intentionally uses another's mark as a means of establishing a link in consumers' minds with the other's enterprise, and directly profits from that link, there is an unmistakable aura of deception.  Such a use is, by its very nature, "likely to cause confusion, or to cause mistake, or to deceive."

*Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 35 (1st Cir. 1989).

Therefore, this factor also strongly favors the B.A.A.

### g.      Strength of the Plaintiff's Mark (Factor 8)

The First Circuit has already recognized that the B.A.A.'s BOSTON MARATHON®
mark is a strong mark. *Boston Athletic Ass'n*, 867 F.2d at 32 ("The 'strength' factors militate in
favor of a finding that the mark held by BAA in 'Boston Marathon' is a strong one").  However
the B.A.A. Marks are not simply strong – they are famous.  "A famous mark is one with
extensive public recognition and renown." *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367,
1371 (Fed. Cir. 2002) (quotations omitted).  Each of the B.A.A. Marks is the subject of at least
one federal incontestable principal register registration.  (Morse Decl. at ¶ 22, Ex. 8.)  Each has
been in continuous use in connection with entertainment services, namely the staging marathon
races, for over 100 years.  (*Id.* at 11.)  Each has been used in connection with the sale of apparel
and other merchandise for over thirty years.  (*Id.* at 12.)

The B.A.A. spends considerable time, effort, and money to organize and conduct the
BOSTON MARATHON® event each year, such that the BOSTON MARATHON® race is the
premiere marathon event, drawing tens of thousands of participants and hundreds of thousands of
spectators and television viewers from all over the world.  (*Id.* at ¶¶ 8-9.)  The recognition and
fame attached to the B.A.A. Marks as used in connection with the B.A.A.'s goods and services
subsists in the minds of the consumers to an extent that judicial notice of the fame of the B.A.A.
Marks is warranted.  *See I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 46-47 (1st Cir.
1998).

The fact that the B.A.A. Marks have achieved significant public recognition and fame
weighs strongly in favor of a conclusion of likely confusion.  *See Recot, Inc. v. Becton*, 214 F.3d

1322, 1327 (Fed. Cir. 2000) ("Famous marks ... enjoy a wide latitude of legal protection.");

*Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 354 (Fed. Cir. 1992) ("In

consonance with the purposes and origins of trademark protection, the Lanham Act provides a

broader range of protection as a mark's fame grows.").  There can be no question that this factor

strongly supports B.A.A.'s motion for a preliminary injunction.

Thus, an analysis of the eight *Volkswagenwerk* factors strongly supports a finding that

consumer confusion, stemming from the Defendants' use of the B.A.A. Marks and confusingly

similar variations thereof, is extremely likely.

### D.      Absent An Injunction, Plaintiff Will Suffer Irreparable Harm

If Defendants are permitted to continue their blatant sales of counterfeit and infringing

goods, the goodwill associated with the B.A.A. Marks, and the B.A.A.'s ability to control the

reputation and quality of its goods, will be in jeopardy.  (Morse Decl. at ¶¶ 9-10.)  The resulting

damage to Plaintiff will be irreparable.

Moreover, the B.A.A. relies almost exclusively on the substantial fees it receives from

official sponsors, and on royalty payments from its trademark licensing program, to defray the

cost of the BOSTON MARATHON® event each year.  (*Id.* at ¶ 9.)  It is unlikely that the

B.A.A.'s sponsors and licensees would elect to continue their relationship with the B.A.A. if the

exclusive benefits of those relationships were eroded by unauthorized use of the B.A.A. Marks

by third parties, who enjoy the privileges for free.   It is therefore critical that the B.A.A. act

quickly to protect the goodwill and exclusivity of the B.A.A. Marks from counterfeit and

infringing use.

Although the 2010 BOSTON MARATHON® event has already taken place, that should

not defeat a finding of irreparable harm.  The B.A.A. Marks do not have a "shelf life" that

renders them valid and enforceable only for some brief period of time immediately preceding or during the annual BOSTON MARATHON® event.  While interest in the event may peak around race weekend, BOSTON MARATHON® merchandise continues to be sold by the BAA's licensees throughout the year.  The fact that Defendants identify the merchandise they sell at their websites as "Boston Marathon **Gifts**" and the fact that they still continue to sell their infringing products after the 2010 race is over proves the appeal that these types of items are presumed to have for consumers, even weeks after the actual event.  Consumers looking for a way to commemorate the annual race or to congratulate a qualifier or a participant once the race is over will look for official BSTON MARATHON® merchandise.  They should find the B.A.A. and its licensees, not Defendants.

### 1.      Irreparable Harm is Presumed

The First Circuit, and district courts within it, have consistently held that trademark infringement automatically leads to irreparable harm:

> In the second place, the district court erred in suggesting that proof of actual harm to Nestle's goodwill was a prerequisite to finding a Lanham Trade-Mark Act violation. The Lanham Act contains no such proof-of-injury requirement. By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement as a matter of law.

*Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992); *see also I.P. Lund*, 163 F.3d at 33 (in trademark cases, "irreparable harm may be presumed"); *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989) (same); *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14 (1st Cir. 1986) ("There is considerable authority for the view that the irreparable injury requirement is satisfied once it is shown that the defendant is wrongfully trading on the plaintiff's reputation.").

There is no question that Defendants infringe the B.A.A. Marks, as explained above. Therefore irreparable harm is presumed.

### 2.      Plaintiff's Lost Sales Are Difficult to Quantify

Even if evidence of irreparable harm were required, the B.A.A. has such evidence in the form of immeasurable losses of business.  Visitors to Defendants' sites might be duped into buying merchandise that is not official, and which does not meet the B.A.A.'s standards for quality.  (Morse Decl. at ¶ 25.)  This could lead to reduced demand for B.A.A. officially-licensed goods.  Even ignoring differences in quality between the officially-licensed products and Defendants' infringing goods, Defendants' sales siphon off revenue that properly belongs to B.A.A.'s licensees, and through them, B.A.A.  Ultimately, however, Defendants' unauthorized use jeopardizes the future of the B.A.A.'s sponsorship and licensing programs, and impacts the B.A.A.'s long-term viability, and that of the annual marathon event.  (Morse Decl. at ¶¶ 9-10.)

While actual losses are known to have occurred, it would be virtually impossible to quantify the full scope of loss with precision as the number of confused customers and the damage to the B.A.A. Marks are simply immeasurable.  This, of course, is why no showing of irreparable harm is required in trademark cases.  *See Nestle*, 482 F.2d at 640.

### 3.      Defendants' Inferior Products Will Damage the B.A.A.'s Reputation

A third basis for finding irreparable harm is the damage to B.A.A.'s reputation that will inevitably result from its product being confused or associated with an inferior product.  The First Circuit has recognized that "[f]ew harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it."  *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 700 (1st Cir. 1987).

Defendants' products are inferior substitutes for Plaintiff's officially licensed goods. (Morse Decl. at ¶ 25.)  adidas is the B.A.A.'s official apparel licensee, and the adidas apparel items that bear the B.A.A. Marks are high-quality athletic wear.  (*Id.*)  The samples obtained by the B.A.A. from the Defendants' websites reveal goods that are of arguably low quality, both in terms of design format and materials.  (*Id.*)  Consumers purchasing these goods from the Defendants will inevitably associate the B.A.A. Marks and the BOSTON MARATHON® event with this type of low quality merchandise.  This association will irreparably damage the B.A.A. and the goodwill it, through its select licensees, have built up in the B.A.A. Marks.  The B.A.A. will be irreparably harmed by being associated with the Defendants' products.  *See Id*.

For all the above reasons, Plaintiff has and will continue to suffer irreparable harm unless the requested preliminary injunction is granted.

### E.    An Injunction Will Impose Minimal Harm On Defendant

An injunction would not stop Defendant from selling apparel and merchandise such as mugs, hats, and stickers.  Entry of the requested injunction would only require that Defendants stop infringing the B.A.A. Marks, by removing those particular items from sale, and by deleting all use of the B.A.A. Marks on their websites.  Defendants could even continue to sell apparel and merchandise that relate to "marathons" generically, just without the benefit of using the B.A.A. Marks or any designations that are confusingly similar to the B.A.A. Marks, or which create a false association with the B.A.A.  The impact on Defendants would be negligible.  Any harm or expense to Defendants from making these changes would, in any event, be of the Defendants' own doing, having no doubt gone into this situation well aware of the B.A.A. Marks.  *See Schawbel Corp. v. Conair Corp.*, 122 F. Supp. 2d 71, 85 (D. Mass. 2000) (where harm to defendant is of defendant's own doing, plaintiff prevailed on balance of harms), aff'd,

2001 WL 210926 (Fed. Cir. 2001).  As this Court noted in a similar case, the requested relief is

actually in Defendants' best interests:

> Should we deny preliminary relief, [each Defendant] may be more firmly entrenched in the American market by the time of trial, making permanent relief more problematical. Under these circumstances, a preliminary injunction is in one sense "an act of kindness" to the defendant, since "[i]t cuts him off from a business life which, from all the portents, would involve a series of trademark frustrations."

*Trak Inc. v. Benner Ski KG*, 475 F. Supp. 1076, 1078 (D. Mass. 1979) (internal citation omitted).

The balance of hardships strongly favors entry of the injunction.

### F.    The Public Interest Favors An Injunction To Prevent Confusion

It is well established that the public interest favors granting a preliminary injunction to

prevent confusion of consumers as a result of a defendant's trademark infringement.  *Digital*

*Equipment Corp. v. AltaVista Technology, Inc.*, 960 F. Supp. 456, 472 (D. Mass. 1997) (citing

*Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987) (where plaintiff

shows likelihood of success on the merits, issuance of preliminary injunction serves the public

interest "given the societal value of full disclosure and fair competition, together with the policy

of the law to provide at least minimal protection to established trade names.")); *see also*

*Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F.Supp. 994, 1015 (D. Mass. 1988)

("[p]reventing consumer confusion is clearly in the public interest.").

In this case, the public interest plainly favors preventing the confusion that is likely to

result from the continued sale by Defendants of counterfeit and infringing merchandise.

## IV. CONCLUSION

The B.A.A. respectfully requests that the Court grant its Motion and preliminarily enjoin

Defendants from use of identical counterfeits and confusingly similar imitations of the B.A.A.

Marks.

Respectfully submitted,


Dated:  April 30, 2010                    /s/ Amy L. Brosius
                                          Amy L. Brosius (BBO # 656521)
                                          Michael C. Lynn (BBO # 673060)
                                          FISH & RICHARDSON, P.C.
                                          225 Franklin Street
                                          Boston, MA 02110-2804
                                          Tel: (617) 542-5070
                                          FAX: (617) 542-8906

                                          Attorneys for the Plaintiff, Boston Athletic
                                          Association

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing as filed with the Clerk of the Court through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  I further certify that a true copy of the above document was served upon the following by mail on April 30, 2010.


CafePress.com
Attn: Candice Carr
Intellectual Property Rights Agent
1850 Gateway Drive
Suite 300
San Mateo, CA 94404


Zazzle, Inc.
Copyright Agent
c/o Zazzle Inc.
1900 Seaport Blvd., Fourth Floor
Redwood City, CA 94063


/s/ Amy L. Brosius
Amy L. Brosius